ACCEPTED
13-14-00565-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
3/5/2015 8:36:04 PM
DORIAN RAMIREZ
CLERK

## NO.  13-14-00565-CV

## IN THE THIRTEENTH COURT OF APPEALS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
3/5/2015 8:36:04 PM
DORIAN E. RAMIREZ
Clerk

## CORPUS CHRISTI, TEXAS

_____

### FRANCIS W.  SINATRA
#### Appellant

#### v.

### CYNTHIA SINATRA,
#### Appellee

_____

**Appealed from the 329th Judicial District Court, Wharton County, Texas**

_____

## APPELLANT'S BRIEF

_____

LYNN KURIGER STANTON            WARREN COLE
State Bar No. 11767600          State Bar No.  04549500
JENKINS & KAMIN, L.L.P.         LAW OFFICE OF WARREN COLE
TWO GREENWAY PLAZA, STE.  600   3355 W.  ALABAMA, STE.  825
HOUSTON, TEXAS 77046            HOUSTON, TEXAS 77098
TEL:  (713) 600-5500            TEL:  (713) 275-4444
FAX: (713) 600-5501             FAX:   (713) 400-9144
lstanton@jenkinskamin.com       warren@warcolelaw.com

ATTORNEYS FOR APPELLANT
FRANCIS W.  SINATRA, JR.

## ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

Appellant
FRANCIS W.  SINATRA

Appellant's Counsel

Warren Cole
LAW OFFICE OF WARREN COLE
3355 W. Alabama, Suite 825
Houston, TX 77098
Tel: (713) 275-4444
Fax: (713) 400-9144
Email: warren@warcolelaw.com

Lynn Kuriger Stanton
JENKINS & KAMIN, L.L.P.
Two Greenway Plaza, Ste.  600
Houston, TX 77046
Tel: (713) 600-5500
Fax: (713) 600-5501
Email: lstanton@jenkinskamin.com

Appellee
CYNTHIA SINATRA

Appellee's Counsel

Robinson C.  Ramsey
LANGLEY & BANACK, INC.
Trinity Plaza II, Suite 900
745 E.  Mulberry
San Antonio, TX 78212
Tel: (210) 736-6600
Fax: (210) 735-6889
rramsey@langleybanack.com

John C.  Maher, Jr.
LAW OFFICE OF JOHN C. MAHER, JR.
212 E. Burleson Street
Wharton, TX 77488
Tel: (979) 531-0322
Fax: (979) 531-0355
johncmaher@sbcglobal.net

# TABLE OF CONTENTS

**Identity of Parties and Counsel** .............................................................................ii

**Table of Contents** ..................................................................................................iii

**Index of Authorities** ..........................................................................................viii

**Statement of the Case** ..........................................................................................xii

**Issues Presented**...................................................................................................xiv

**Statements of Facts**

    Overview and Context
    Parties, Their Relationship, and This Lawsuit ................................................1

    Relevant Provisions in March 29, 2001 Decree .............................................3

    Monies Paid to Cynthia or for Cynthia's Benefit ..........................................6

    Relationship Strained and Deteriorating over Money ...................................7

**Summary of the Argument** ..................................................................................10

**Argument and Authorities** ..................................................................................15

**I.**     <u>**Issue One**</u> ......................................................................................................15

    **The trial court abused its discretion when it ruled that Frank and Cynthia entered into an informal marriage on or before April 27, 2002, because there is legally insufficient, or alternatively, factually insufficient evidence to establish the requisite elements: (1) an agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married.**

A.  Standard of Review ...........................................................15

B.  Texas Family Code § 2.401 ..............................................16

C.  Evidence is legally and factually insufficient to prove that Cynthia and Frank entered into an agreement to be married ............18

D.  Evidence is legally and factually insufficient to prove Cynthia and Frank lived together in this state as husband and wife ............25

E.  Evidence is legally and factually insufficient to prove that Cynthia and Frank held out as husband and wife in a non-social context such as financial and legal matters; any references to "husband" and "wife" occurred in a social context ..........................29

**II.  Issue Two** ...............................................................................33

**Because the evidence was legally and factually insufficient to support the community property character of the Hensal Road home and the funding into the trust's bank account which purchased the home, the trial court erred when it failed to confirm the Francis W. Sinatra Trust as Frank's separate property, when it mischaracterized the funds that had purchased the Hensal Road house as community property, and when it awarded one-half of the Hensal Road house to Cynthia.**

A.  Introduction .................................................................33

B.  Standard of Review .......................................................34

C.  Cynthia's stipulations as to Frank's separate property were judicial admissions and relieved Frank of any burden to present further proof. When the court allowed Cynthia to withdraw her stipulation at the close of evidence, Frank suffered clearly prejudicial harm ..................................................................36

D.  Applicable rules for separate and community property ....................39

E.    Measuring the record evidence against the rules governing characterization shows the evidence is legally and factually insufficient to support the trial court findings ...................................40

**III.**   **Issue Three** .......................................................................................47

**The trial court abused its discretion when it ordered Frank to pay Cynthia a judgment in the amount of \$500,000 to equalize its division, because there is legally insufficient, or alternatively, factually insufficient evidence to support the court's finding that Frank had possession and control of \$1,000,000 in unspent cash and earnings paid to him during marriage.**

A.    Standard of Review................................................................47

B.    There is no evidence to support the finding that Frank has possession and control of at least \$1,000,000 in unspent cash which was "not revealed or identified" .............................................47

**IV.**   **Issue Four** .........................................................................................52

**The trial court's mischaracterization of the Hensal Road house as community property, together with the equalization judgment of \$500,000, caused the trial court to abuse its discretion in making its property division where the values of the assets and the equalization judgment awarded to Cynthia resulted in a manifestly unfair, unjust, and disproportionate division of the marital estate which is not "just and right" and which is not supported by legally and factually sufficient evidence.**

A.    Standard of Review................................................................52

B.    The parties accumulated no community estate during the informal marriage .................................................................................53

C.    Court's characterization and equalization created a community estate which could then be divided ...................................................53

v

D.     There is no evidence or factually insufficient evidence to support the finding that this division is "just and right." ...............................54

**V.    <u>Issue Five</u>** ........................................................................................55

**The trial court abused its discretion when it ordered Frank to pay Cynthia $5,000 per month, because the evidence is legally insufficient, or alternatively, factually insufficient to support the statutory prerequisites for spousal maintenance.**

A.     Standard of Review .............................................................55

B.     Statutory Provisions ...........................................................55

C.     Distinguishing facts take this case outside the realm of general spousal maintenance considerations ...................................56

**Prayer for Relief** ...............................................................................59

**Certificate of Compliance** .................................................................60

**Certificate of Service** ........................................................................61

**Appendix**

    **Final Decree of Divorce, June 26, 2014**

    **Findings of Fact and Conclusions of Law**

    **Final Consent Decree of Divorce, March 29, 2001**

    **Summary of $$ Paid to-for Cynthia, RX-52**

    **Frank's Trial Inventory.  RX-72**

    **Petitioner's Exhibits 27 - 31**

**Texas Family Code, Sec.  2.401**

**Texas Family Code, Sec.  8.051**

**Texas Family Code, Sec.  8.052**

**Texas Family Code, Sec.  8.053**

# INDEX OF AUTHORITIES

**Cases**

*Amador v. Berrospe*, 961 S.W.2d 205 (Tex.App.–Houston
[1ˢᵗ Dist.] 1996, writ denied). ...................................................................15

*Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223 (Tex. 1991)..............................15

*Bomar Oil and Gas, Inc. v. Loyd,* 381 S.W.3d 689
(Tex.App.–Amarillo 2012, pet. denied) ........................................................38

*Boyd v. Boyd*, 131 S.W.3d 605(Tex.App.–Fort Worth
2004, no pet.)..........................................................................................40, 44

*Burden v. Burden*, 420 S.W.3d 305
(Tex.App.–Texarkana 2013, no pet.). ................................15,18, 19, 22, 25

*Cain v. Bain,* 709 S.W.2d 175 (Tex. 1986).............................................................16

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex. 2005).............................................16

*Davila v. Davila,* 2013 WL 53058832 (Tex.App.–
Corpus Christi 2013, pet. denied)(mem.op.) ...............................................35

*Diaz v., Diaz,* 350 S.W.251 (Tex.App.–San Antonio
2011, no pet.) .............................................................................................55

*Downer v. Aquamarine Operators, Inc.,*
701 S.W.2d 238(Tex. 1985) ........................................................................39

*Eggemeyer v. Eggemeyer,* 554 S.W.2d 137(Tex. 1977) ......................................46

*Estate of Hanau v. Hanau,* 730 S.W.2d 663 (Tex. 1987) ...................................40

*Gary v. Gary,* 490 S.W.2d 929(Tex.Civ.App.–Tyler
1973, writ ref'd n.r.e.).................................................................................19

*Gulf Construction Co.  Inc.  v.  Self,* 676 S.W.2d 624
(Tex.App.–Corpus Christi 1984, writ ref'd n.r.e.) ....................................37

*Holloway v.  Holloway,* 671 S.W.2d 51 (Tex.App.–Dallas
1983, writ dism'd w.o.j.) ...................................................................48

*In re McFarland,* 176 S.W.3d 650 (Tex.App.–Texarkana
2005, no pet.) ..................................................................................56

*In the Matter of the Marriage of Tandy,* 532 S.W.2d 714
(Tex.Civ.App.–Amarillo 1976, no writ) ......................................................45

*Landon v.  Jean-Paul Budinger, Inc.,* 724 S.W.2d 931
(Tex.App.–Austin 1987, no writ) ...............................................................52

*Lewis v.  Anderson,* 173 S.W.3d 556
(Tex.App.–Dallas 2005, pet.  denied)..........................................18, 20, 23, 32

*Massey v.  Massey,* 807 S.W.2d 391  (Tex.App.–Houston
[1st Dist.] 1991), *writ denied* at 867 S.W.2d 766 (1993).......................47, 52

*McElwee v.  McElwee,* 911 S.W.2d 182 (Tex.App.–Houston
[1st Dist.] 1995, writ denied) .....................................................................36

*Moroch v.Collins,* 174 S.W.3d 849
(Tex.App.–Dallas 2005, pet. denied)....................................................15, 36

*Murff v.  Murff,* 615 S.W.2d 696 (Tex.  1981)...............................................46

*Parr v.  State,* 2014 WL 69567 (Tex.App.–Corpus Christi 2014,
no pet.)(mem.op.) .................................................................................39

*Russell v.  Russell,* 865 S.W.2d 929 (Tex.  1993) ...............................................17

*Shepherd v.  Ledford,* 962 S.W.2d 28 (Tex.  1998).................................................37

*Sibley v. Sibley,* 286 S.W.2d 657 (Tex.Civ.App.–Dallas
1955, writ dism'd) ................................................................49

*Smith v. Smith*, 22 S.W.3d 140 (Tex.App.–Houston
[14th Dist.] 2000, no pet..)................................................40, 46

*Tellez v. Tellez*, 345 S.W.3d 689 (Tex.App.–Dallas
2011, no pet.) .................................................................56

*Tompkins v. State*, 774 S.W.2d 195 (Tex.Crim.App. 1987) .........................17, 19

*Valdez v. Barrera,* 647 S.W.2d 377(Tex.App.–San Antonio
1983, no writ). ..................................................................21

*Viera v. Viera,* 331 S.W.3d 195 (Tex.App.–El Paso 2011, no pet.). ...................35

*Welch v. Welch,* 694 S.W.2d 374(Tex.App.–Houston
[14th Dist.] 1985, no writ). .....................................................52

*Welder v. Welder,* 794 S.W.2d 420 (Tex.App.–Corpus Christi
1990, no writ)...........................................................40, 45, 50

*Winfield v. Renfro,* 621 S.W.2d 640(Tex.App.–Houston
[1st Dist.] 1991, writ denied)...............................18, 19, 23, 25, 26

*Zagorski v. Zagorski*, 116 S.W.3d 309 (Tex.App.–Houston
[14th Dist.] 2003, pet. denied) .........................................40, 44, 50

*Zieba v. Martin,* 928 S.W.2d 782 (Tex.App.–Houston
[14th Dist.] 1996, no writ) ...................................................52

**Statutes and Rules**

TEX.CONST. art. 16 § 15. ..........................................................35

TEX. FAM. CODE § 2.401............................................................16, 18

TEX. FAM. CODE § 3.001. .......................................................................35

TEX. FAM. CODE § 3.002 ....................................................................... 35

TEX. FAM. CODE § 3.003.......................................................................36

TEX. FAM. CODE § 7.001 .......................................................................54

TEX. FAM. CODE § 8.051 .......................................................................55

TEX. FAM. CODE § 8.052 .......................................................................56

TEX. FAM. CODE § 8.053.......................................................................56

TEX. R. CIV. P. 301 .......................................................................27

## STATEMENT OF THE CASE

### *Nature of the Case*

This is an informal (common law) marriage case. After the trial court ruled that an informal marriage existed, the court tried property issues and entered a Final Decree of Divorce.

### *Trial Court*

The case is appealed from the 329th Judicial District Court, Wharton County, Texas, The Honorable Randy Clapp, Judge Presiding.

The question of informal marriage was tried on July 15 - 16, 2013. Following the ruling that a marriage existed, the court held hearing on property issues on June 2 - 3, 2014.

### *Parties' Allegations and Course of Proceedings*

This case was brought by Cynthia Sinatra (Cynthia) against Francis W. Sinatra (Frank). Cynthia and Frank were previously married. The parties' formal marriage of October 15, 1998, was dissolved by a final decree entered on March 29, 2001. [CR 52-79; PX 111] By way of four petitions, Cynthia asserted four different dates at which she claimed a common law marriage came into existence: on or about May 2001 [CR 110]; on or about February 7, 2000 [CR 21]; on or about April 29, 2001 [CR 42]; on or about March 29, 2001 [CR 84]. Cynthia requested division of "community property" with a disproportionate share awarded to her. [CR 86-87]

Frank's original answer denied any informal marriage, and alleged estoppel (under the prior divorce decree), waiver (acceptance of benefits from the 2001 decree), and fraud in her allegations of when and how the parties' allegedly entered into a common law marriage. [CR 49-51] Frank's Amended Answer and Counter Petition carried his affirmative defenses of waiver and estoppel, more specifically pleading the waiver terms of the prior decree which provided that all claims to the separate property of the other were waived for the lifetime of the parties. [CR 162-165] Frank further alleged that no community property could exist, but if it did, he requested a disproportionate share. [CR 165]

***Disposition in Trial Court***

The court entered a Final Decree of Divorce on June 26, 2014. At issue in this appeal are the court's rulings on informal marriage, the court's award of a 50% interest in Frank's California home to Cynthia, the court's award of a $500,000 money judgment to Cynthia, and spousal maintenance. [CR 193, 196-97, 201-02, 202-03, 208-09]

Frank filed a Motion for New Trial on July 24, 2014, which was denied on September 15, 2014. [CR 216-221; 231] The court signed and entered its Findings of Fact and Conclusions of Law on August 14, 2014. [CR 224-5] The court did not enter additional or amended findings and conclusions as requested by Frank on August 25, 2014. [CR 226]

Notice of Appeal was filed on September 23, 2014. [CR 235] Frank superseded the judgment on January 6, 2015. [CR 272 - 281]

# ISSUES PRESENTED

## *Issue Relating to Informal Marriage*

### Issue One

**The trial court abused its discretion when it ruled that Frank and Cynthia entered into an informal marriage on or before April 27, 2002, because there is legally insufficient, or alternatively, factually insufficient evidence to establish the requisite elements: (1) an agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married.** [Challenging Final Decree CR 193, 208-209; Interlocutory Order-Common Law Marriage CR 156-57; Findings of Fact and Conclusions of Law CR 224-25 at ¶¶ 3, 4, 5, 7, 11, 13, 26; See, Request for Additional and Amended Findings of Fact and Conclusions of Law CR226-27 at ¶¶ 1, 2, 3, 4 CR 229 at ¶ 11, See also Motion for New Trial CR 217 at ¶¶ 5, 6]

## *Issues Relating to Characterization and Division of Property*

Because Frank contends that the trial court's ruling on common law-informal marriage is contrary to Texas law and should be reversed, he also contends that all subsequent rulings which purport to divide a community estate and which characterize portions of Frank's separate property as owned by the non-existent community estate and awarded to Cynthia are an abuse of discretion and erroneous as a matter of law. However, in the event the Honorable Court upholds the common law marriage theory, then Frank presents the following additional issues complaining of the trial court's Final Decree of Divorce.

## Issue Two

**Because the evidence was legally and factually insufficient to establish the community property character of the Hensal Road home and the funding into the trust's bank account which purchased the home, the trial court erred when it failed to confirm the Francis W. Sinatra Trust as Frank's separate property, when it mischaracterized the funds that had purchased the Hensal Road house as community property, and when it awarded one-half of the Hensal Road house to Cynthia.** [Challenging Final Decree at CR 194-95, 196-97, 198-99, 201-02; Findings of Fact and Conclusions of Law at CR 224-25, ¶¶ 7, 14, 16, 28; RR 6: 59-60; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at CR227 ¶¶ 5, 6, CR 228 at ¶ 9, CR 229 at ¶ 12, CR 230 at ¶ 13; See also Motion for New Trial CR 218 at ¶¶ 7, 8, 9]

## Issue Three

**The trial court abused its discretion when it ordered Frank to pay Cynthia a judgment in the amount of $500,000 to equalize its division, because there is legally insufficient, or alternatively, factually insufficient evidence to support the court's finding that Frank had possession and control of $1,000,000 in unspent cash and earnings paid to him during marriage.** [Challenging Final Decree at CR 202; Findings of Fact and Conclusions of Law at CR 224-25, ¶¶ 13, 28; RR 6: 61-62; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at CR 227-28 at ¶¶ 7, 8, CR 230 at ¶ 14; See also Motion for New Trial at CR 218-19, ¶ 10]

## Issue Four

**The trial court's mischaracterization of the Hensal Road house as community property, together with the equalization judgment of $500,000, caused the trial court to abuse its discretion in making its property division where the values of the assets and the equalization judgment awarded to Cynthia resulted in a manifestly unfair, unjust, and disproportionate division of the marital estate which is not "just and right" and which is not supported by legally and factually sufficient evidence.** [Challenging Final Decree at CR 194-200, 202-03; Findings of Fact and Conclusions of Law at CR 1 - 2, ¶¶ 7, 11, 13, 14, 28; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at

CR227 ¶¶ 5, 6, 7, 8, CR 228 at ¶ 7, 8, 9, CR 229 at ¶ 12, CR 230 at ¶¶ 13, 14]

**Issue Five**

      **The trial court abused its discretion when it ordered Frank to pay Cynthia $5,000 per month, because the evidence is legally insufficient, or alternatively, factually insufficient to support the statutory prerequisites for spousal maintenance.** [Challenging Final Decree at CR 202-03; Findings of Fact and Conclusions of Law at CR 225, ¶¶ 21, 22, 23; RR 6: 62-63; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law CR 229 at ¶¶ 19, 11; See also, Motion for New Trial at CR 219, ¶ 11]

**STATEMENT OF FACTS**

*Overview and Context*
*Parties, Their Relationship, and This Lawsuit*

Francis Wayne Sinatra (Frank) is a life-long resident of California. [RR 3: 52-53, 93-94; RR 6: 9] Frank is a performing musician who travels extensively, but he has always maintained his home in California. [RR 3: 53-55; RR 6: 36] Cynthia admitted that Frank has always resided in California. [RR 3: 54; RR 5: 52]

Cynthia White Sinatra is a resident of Wharton County, Texas. Cynthia and her family are long-time residents of Wharton. [RR 3: 117] Prior to her marriage to Frank, Cynthia had been married twice and had three daughters. Cynthia and her daughters moved to California during her 1998-2001 marriage to Frank, and they remained in California for the months immediately following the 2001 divorce so that the girls could complete the academic year. [RR 8: PX-1 at App. 1, p. 9; RR 2: 66-68, 311]

Due to the demands of his professional life, Frank had never considered marriage until he dated Cynthia White of Wharton, Texas. [RR 3: 118-19] Frank was fifty-five years old when he married Cynthia on October 15, 1998. [RR 2: 61] Their brief marriage ended in divorce on March 29, 2001, but Frank and Cynthia remained close. [RR 2: 41-42, 46-47, 91-92, 125, 130, 134, 141] Cynthia characterized their

1

relationship as one with "banter," but Frank testified that he had petitioned for divorce to stop the insanity. He said they were not happy as husband and wife, became immeasurably happier when not married, and did much better as friends. [RR 3: 50, 96-97, 132] Following divorce, Frank and Cynthia continued to travel together, and Frank visited Cynthia and her daughters in Texas. Frank testified their relationship was "stormy," with good days and bad days, getting along or not getting along. [RR 3: 106-07] Cynthia testified the relationship had been "back and forth" since 1992, and she admitted she was overly dramatic in some of her writings to Frank. [RR 3: 54; RR 8: referencing letter written 8/31/09, PX-29, PX-30; see additional correspondence at RR 24: RX-36, RX-38]

Cynthia is a licensed Texas attorney. While Cynthia and Frank were dating, Cynthia worked pro bono on a case at The Hague, and the representation continued for a short time during the marriage. [RR2: 71-72] However, Cynthia did not choose to rely on her law license to support herself or her daughters. From 1992 until the present time, Cynthia has relied on Frank's financial generosity. [RR 2: 319-321, 359; RR 3: 27-28, 29-30, 37-40, 110-11; RR 5: 48-50]

Shortly before Cynthia and Frank were divorced in 2001, the father of two of Cynthia's daughters was sent to prison. He remained in prison until 2007. The father provided no financial support for the two girls. Frank loved the girls and wanted

them to have everything they needed. [RR 2: 66-7; RR 6: 20] Although Frank had no obligation to do so, he provided for the girls and for Cynthia because he felt it was the appropriate thing to do. [RR 3: 110-12] He continued to provide for them financially as long as he was able to do so. [RR 3: 111-12, 114] Over the years, Cynthia's financial demands became such a burden that Frank has been forced to borrow money from a sister so that he could pay Cynthia court-ordered support during the pendency of this case. Frank is out of money. [RR 2: 282-86; RR 3: 31, 34, 37-40; RR 5: 116 - 117, 118; RR 6: 10, 20 ]

### Relevant Provisions in March 29, 2001Decree

Frank and Cynthia were divorced on March 29, 2001. The Final Consent Decree is part of the record in this case. [RR 8: PX-1] The decree provided for monthly installment payments and lump sum payments to Cynthia.[RR 8: PX-1, ¶ 8] The decree also referenced the parties' Post Marital Agreement which provided additional terms and payments to Cynthia. (The agreement was incorporated and attached as Appendix 1). The section on Spousal Support states:

> Spousal Support. In addition to the lump sum payment stated above, FRANK shall pay to CYNTHIA as and for non-modifiable Spousal Support the sum of Five Thousand Dollars ($5,000) per month payable one-half (½) on the 1st and one-half (½) on the 15th days of each month for a period of twenty-four (24) consecutive months commencing on the 1st day of the first month following the termination of the parties marriage by the Court. **Said spousal support shall terminate upon the**

3

**death or remarriage of CYNTHIA, FRANK'S death, or twenty-four (24) months whichever shall first occur.**

[RR 8: PX-1, App. 1, p. 8 ¶ 6.2, B, emphasis added]   Under the decree, support commenced on April 1, 2001, and continued through March 31, 2003.  Because Cynthia did not remarry, the support payments did not terminate before the end of the two-year term.  Cynthia admitted that Frank paid all the support payments and complied with all provisions contained in this decree. [RR 3: 28, 110] [1]

The 2001 decree also attached schedules of each party's separate property. Frank's separate property was listed at Schedule A.  The properties listed at Schedule A, ¶ 4  were part of the estate of Frank Sinatra, Sr.  and were owned by Frank as his inheritance from his father.   [RR 2: 271-73;  RR 5: 81, 92-94, 97 - 99]

At trial, Cynthia stipulated that properties listed on her inventory at lines 78-102 were Frank's separate property from the previous divorce decree. [RR 4: 99, CR 212-13] Because Cynthia had acknowledged the separate character of properties listed at lines 78-102 in her inventory, and because she stipulated to the separate character of those same properties at trial, Frank did not present  detailed evidence on his separate property.  However, at the conclusion of the trial, and after witnesses

---

[1]        Cynthia's Second Amended Petition alleged a second marriage occurred on or about the same day she and Frank were divorced, March 29, 2001.  She could not have remarried unless she forfeited spousal payment, which she did not. [RR 3: 28, 110; CR 84 at ¶¶ 6.  a., b., and c.] ]

4

had been dismissed, Cynthia withdrew her stipulation as to Frank's separate property trust, the Francis W. Sinatra Trust. Frank protested the withdrawal, but the trial court allowed her to do so. [RR 6: 40; CR 212 (line 85)]; see also RR 6: 43-44]

The 2001 decree also contained waiver provisions as to separate property owned by Frank, to wit:

> The Parties agree that FRANK owns and has the exclusive right to possess and enjoy as his sole and separate estate, free from any claim of CYNTHIA, the property listed in Schedule A, which is attached to this agreement and incorporated herein for all purposes.

[PX-1, p. 2 ¶ 2.1] As additional waiver provisions, the decree states:

> Each party agrees that the respective separate property of the parties will be free from all claims that the other party may have before the date of this agreement, as well as all claims that may arise following the execution of this agreement . . This waiver applies during the lifetime of both parties. . . . .Each party further agrees that, by signing this agreement and accepting any benefit whatsoever under it, he or she is estopped from making any claim of any kind at any time to any separate property or the separate estate of the other party. . .

[ PX-1, p. 5-6 at ¶ 3.3 (emphasis added)]

In this case, Frank's Amended Answer and Counter Petition alleged the terms relating to waiver and further alleged that Cynthia should be estopped from asserting claims in contravention of the terms of the 2001 decree, where the terms had not been modified or discharged by written instrument. [CR 162-63]

5

### *Monies Paid to Cynthia or for Cynthia's Benefit*

Post-divorce, Frank gifted monies directly to Cynthia and also made payments for the benefit of Cynthia and her daughters. [RR 2: 141-42, 192-93, 282-284, 285, 295-97, 319-22; RR 3: 110-111; RR 6: 18, 20; RR 8: PX - 27, PX - 28; RR 25: RX-52] Randal O'Connor is a CPA whose firm has worked with Frank and Frank's family for many years. He handles their taxes, pays bills, and oversees financial affairs. [RR 2: 272-273]

O'Connor testified as to Franks's financial matters and prepared exhibits as shorthand renditions of evidence contained in Frank's financial records. Based upon his work in preparing tax returns, managing Frank's financial affairs, and signing the checks to pay the bills, he prepared an exhibit entitled "Summary of $$ to/for Benefit of CS." [RR 25: RX-52] The numbers on RX-52 represent monies in the amount of $4,712,659 (hereinafter referred to as "4.7 million") paid to Cynthia from 2003-2013. Frank was required to file federal gift tax returns and pay gift taxes on the $4.7 million, because Frank and Cynthia were not married. [RR 2: 275-76] Some of the gifted monies are not shown on the gift tax returns because payments were made for expenses such as education and medical, which are not classified as gifts for IRS purposes. [RR 5: 105-06]

### *Relationship Strained and Deteriorating over Money*

Cynthia testified that Frank was an extremely generous individual. [RR 3: 37] Donna Kubesch, Cynthia's childhood friend from Wharton testified that Cynthia talked to her about Frank's generosity. [RR 2: 46-47] Another childhood friend Elizabeth Bray testified that she saw Frank when he came back to town, it was an event, celebratory, and she thinks of Frank as very kind, generous, and respectful. [RR 2: 246, 250] Cynthia described some of the items Frank paid for: travel expenses, car notes, groceries, summer camps; anytime she needed money, Frank just transferred money. [RR 2: 320, 339]

Cynthia testified that prior to 2008, she had no limit on her expenditures. [RR 3: 39-40] Frank testified that he paid for tuition, rent, food, clothing, gasoline, bought automobiles. [RR 3: 111] O'Connor testified that he wrote checks to pay for items and to give money to Frank to pay for her items, such as house notes, groceries, pool maintenance, maids, house repairs, clothing, medical expenses. [ RR 2: 294-96]

O'Connor testified he had conversations with Frank "all the time" about funding Cynthia's expenses, which were "way beyond his means," and put him in a bad financial position. [RR 2: 283-84] Frank talked to Cynthia about his financial situation, but she didn't believe him when he said the money was running short. [RR

2: 148-49] Since Cynthia did not believe him, a meeting was called at Golden's office in California in March, 2008. [RR 2: 282] The meeting was attended by Frank, Cynthia, Randal O'Connor, Nathan Golden, David Roth, and two accountants. The meeting was intended to be a meeting of information, but it did not go well. Cynthia was crying. She had always believed Frank was made out of money [RR 2: 148-52]

Cynthia testified that she remembered the meeting; she felt threatened by Frank's advisors; she did not believe Frank or Frank's advisors when she was told he was running out of money. [RR 3: 31, 34, 36, 39-40] Following the meeting, there continued to be ongoing discussions between Cynthia and Frank during which he pleaded with Cynthia and tried to get her to slow down on the spending. [RR 2: 158; RR 3: 112]

Cynthia testified that she never asked Frank to spend money on her. [RR 5: 49] Her testimony is untrue and contradicted by her own evidence. Even a small sampling of correspondence belies her assertion. For example, in August 2009, Frank was trying to stop the "financial hemorrhaging" and outlined a list of expenses that he thought he could afford and that were to be paid by his accountants. Copies of the memos were provided to Cynthia, and her letters in response to Frank's memos contain requests for more money, in addition to the expenses he had already agreed to pay. [See RR 8: PX-27 through PX- 31] The financial discussions were ongoing

8

and unpleasant.  [RR 2: 158-163]

Cynthia also contacted O'Connor directly to request payments; she told O'Connor which expenses Frank had approved.  O'Connor followed up with Frank; her statements were not always correct representations of Frank's agreements. [Records from Stephenson, Cynthia's CPA, at RR 23: RX-28, identified here by PDF page numbers 183, 185, 186, 187, 188, 190, 191, 192, 193, 194, 195, 197]

By degrees,  Frank's financial outlays diminished. [RR 3: 114]  The money flow ceased in July 2012. [RR 2: 284]  Cynthia realized in July 2012, that Frank wasn't going to pay the mortgage on her house. [RR 2: 344; RR 3: 27]  Frank's inability to continue to pay for Cynthia's lifestyle caused Cynthia to pursue this lawsuit. [RR 2: 306-07;  RR 3: 27-28, 112, 114; RR 5: 48-49] Frank had been in Wharton in July 2012 to celebrate Brittany's achievement in passing the State's bar exam.  He took Brittany, Victoria, Jessica, Cynthia, Cynthia's mother and several friends to a restaurant in Sugar Land. [RR 2: 85] When he left Texas, he thought he and Cynthia were on good terms; when he arrived back in California he received notice that Cynthia had filed her original petition in this case.  [RR 2: 84-5]  At trial Cynthia admitted her motivation:

Q. . . . If you recall your testimony from one of the past hearings, Ms. Sinatra, when I asked you a few questions, **but for the fact that the money stopped coming to you, you would not have filed for divorce?**

A. **That's probably true.**

[RR 5: 49] [2] Cynthia also admitted that she had done research on common law marriage, on the elements of common law marriage, and that she had a woman who was sending her petitions. [RR 3: 85-86] This law suit ensued.

When asked if he harbored ill feelings towards Cynthia for bringing allegations of common law marriage, Frank responded: "I wish she hadn't done this because I find it a severe violation of trust since she knows full well we've been divorced since 2001." [RR 3: 119]

Each section of Argument and Authorities, *infra,* contains additional specific facts which are relevant to the issue presented.

## SUMMARY OF THE ARGUMENT

**I.** Informal (common law) marriage. In order to establish common law marriage, Cynthia had the burden to prove all 3 elements by a preponderance of the evidence. The element of "the man and woman agreed to be married" cannot be established by

---

[2] After Frank's and Cynthia's divorce, Frank entered into a relationship with Leslie Scallon who lived in California. There was testimony at trial that Cynthia had been aware of Frank's relationship with Leslie, and the birth of their daughter, Josie. Cynthia had known of Josie's birth for 8 or 9 years before she filed this lawsuit. Cynthia said it bothered her, but it did not make her file a law suit. [RR 3: 29-30, 63]

10

implication or by piling inference upon inference. The agreement must be established by probative evidence showing both parties entered into an agreement that was specific to both sides. Frank denied any such agreement ever occurred. Cynthia alleged 4 different dates for marriage, and finally settled on March 29, 2001, the very same day that she and Frank were divorced from the ceremonial marriage.

Common law marriage requires an immediate and permanent relationship in which the husband and wife live together in Texas. The immediate and permanent "living together" could not have occurred as alleged by Cynthia, because Frank left Wharton with his attorneys on March 29, returned to California, and did not visit Texas until Christmas holiday. Visiting Texas is not living in Texas. Episodic and sporadic intimate relations between a formerly-married couple do not equate to living together in Texas as husband and wife.

While the record contains many examples of Cynthia and Frank referring to one another as husband and wife, those references should be analyzed in the context of the historical relationship. Of themselves, the references cannot establish a common law marriage when Frank and Cynthia did not enter into an agreement to be married (element 1); and, Frank and Cynthia did not live together in Texas as husband and wife (element 2).

**II.** <u>Cynthia's withdrawal of her stipulation on Frank's separate property and the trial court's subsequent failure to confirm the Francis W. Sinatra Trust, its bank account, and its assets as Frank's separate property caused the court to divest Frank of his separate property when it awarded of ½ of Frank's home to Cynthia.</u>

Frank inherited substantial assets from his father. Cynthia has stipulated to the separate character of these assets on 3 occasions: in the parties' 2001 divorce decree; in her Inventory and Appraisement in this case; and during trial and on the record in this case. Because Cynthia had stipulated to the separate character of the Francis W. Sinatra Trust, Frank put on a "shorthand" version of his case. At trial the following day, after Frank had closed and after Frank's expert witness had returned to California, Cynthia withdrew her stipulation and the trial court allowed her to do so. In the court's rendition and subsequent findings, the court found that Frank had not established the separate character by "clear and convincing evidence," even though Cynthia's stipulation had admitted and conceded the characterization, thereby relieving Frank of any burden to prove separate character. The court failed to acknowledge that Frank had tried his case under the stipulation.

Nonetheless, Frank's expert witness (testifying after the stipulation had been made) provided evidence on Frank's inheritance, the entities inherited from Frank Sr., the transformations of the entities into holding companies, and the sale of a portion

12

of the inherited assets on November 19, 2007. As Frank's CPA and financial manager, who handles all disbursements and records all deposits from all sources, the witness testified that Frank received $10.1 million at the closing of the sale of Frank Sr.'s assets and the money was received into the trust account. He also testified that one month later the trust account wired $4.1 million to the title company to pay for the purchase of 9706 Hensal Road. Closing documents and deeds uniformly reflect ownership as the Francis W. Sinatra Trust with Frank as the trustee. Under the community out first rule, at the time of the November/December 2007 transaction, there could have been no community income accumulated in the trust's account because withdrawals to pay Cynthia's expenses had depleted the account.

## III. Money judgment for $500,000.

Frank produced all his federal income tax returns and federal gift tax returns. During a 10-year period Frank had gifted Cynthia $4.7 million, an amount which exceeded income that could be deemed community income under the court's ruling of common law marriage. The $1.1 million of "Remaining Com" on Frank's Exhibit R-52 does not refer to cash on hand, unspent. It refers to the total of monies that could be deemed community and that had not been gifted to Cynthia but had been spent on Frank's expenses. Frank did not hide income.

13

**IV.** <u>Divestiture of separate property and manifestly unjust division of property</u>.

During the time of the alleged marriage, income that could be deemed community income was spent on living expenses and gifts (now inter-spousal transfers). There was no accumulation of a community estate. However, by mischaracterizing 9706 Hensal Road as community property, the court created community property in the amount of $2,000,000. The court also found that Frank had unidentified, unrevealed, and unspent cash in the amount of $1 million. This "asset" does not exist, but Frank must pay Cynthia $500,000. Together, these erroneous findings created a community estate out of Frank's separate property (Hensal Road) and out of conjecture ($1,000,000). Because there is legally and factually insufficient evidence to support the court's findings, the court divided a non-existent community estate by awarding Cynthia assets valued at $1.5 million.

**V.** <u>Spousal maintenance</u>.

There is a presumption against an award of spousal maintenance unless the spouse seeking maintenance has exercised diligence in developing necessary skills during a period of separation. Because Cynthia has not make a diligent search for employment and has not developed her skills, she did not rebut the presumption and should not have been awarded $5,000 in monthly maintenance.

## ARGUMENT AND AUTHORITIES

**I.**   **<u>Issue One</u>**

**The trial court abused its discretion when it ruled that Frank and Cynthia entered into an informal marriage on or before April 27, 2002, because there is legally insufficient, or alternatively, factually insufficient evidence to establish the requisite elements:  (1) an agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married.**

### A.   *Standard of Review*

Whether an informal or  common law marriage has come into existence is a question of fact.  *Burden v.  Burden*, 420 S.W.3d 305, 308 (Tex.App.–Texarkana 2013, no pet.).   The evidence is legally insufficient and/or factually insufficient to support the trial court's findings of fact and conclusions of law that address the existence of a common law marriage    Legal and factual insufficiency of the evidence to support findings of fact are not independent grounds of reversible error but are relevant factors in assessing whether the trial court abused its discretion.   *See Beaumont Bank, N.A. v.  Buller,* 806 S.W.2d 223, 226 (Tex.  1991); *see also Moroch v.Collins,* 174 S.W.3d 849, 858 (Tex.App.–Dallas 2005, pet.  denied) (explaining, "We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision.").

In our case, Frank contends that based on the evidence adduced at trial, (and the lack of evidence in important particulars), the trial court did not make a

reasonable decision.  Because a complete reporter's record has been prepared and filed in this case, the trial court's findings are not conclusive.  *See  Amador v. Berrospe*, 961 S.W.2d 205, 207 (Tex.App.–Houston [1ˢᵗ Dist.] 1996, writ denied).

In reviewing a legal insufficiency or "no evidence" point, the reviewing court credits evidence that supports the finding and disregards contrary evidence <u>unless a reasonable fact finder could not</u>. *See City of Keller v.  Wilson,* 168 S.W.3d 802, 827 (Tex.  2005). In reviewing a point for factual insufficiency, the reviewing court considers all the evidence which tends to prove the vital fact, as well as evidence which tends to disprove the vital fact.   When it is determined that the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, the point should be sustained. *See Cain v.  Bain,* 709 S.W.2d 175, 176 (Tex.  1986).

**B.     *Texas Family Code § 2.401***

The Family Code states the requisites for establishing "informal" marriage.  In relevant part, the Code states:

> (a)     In a judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:
>
> * * *
>
> (2)     the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married; . . . .

TEX.  FAM.  CODE § 2.401(a)(2).   Subparagraph(a)(2) contains the three elements

16

which must be proved by the proponent of marriage: (1) an agreement to be married; (2) after the agreement, the couple lived together in this state as husband and wife; and (3) the couple represented to others that they were married.

Since 1989, it has been more difficult for the proponent of informal marriage to establish the first element, *i.e.*, "an agreement to be married." Although common law marriages have been recognized in Texas since 1847, the recognition has been described as "grudging." *See Russell v. Russell,* 865 S.W.2d 929, 931 (Tex. 1993); *see also Tompkins v. State,* 774 S.W.2d 195, 208 (Tex.Crim.App. 1987)(claims of common law marriage are closely scrutinized).

Although the effort to abolish common law marriage in 1989 failed, the legislature amended the statute to make it more difficult to prove up a common law marriage. *Id.* Before the 1989 amendment, courts were allowed to infer, or to imply, a couple's agreement to be married from other evidence which established cohabitation and public representation. After the 1989 amendment, a marriage proponent is now required to prove all three elements of the common law marriage, including the agreement to be married. The ability of a court to infer and /or to imply a marriage agreement was eliminated. *Id.* at 932, 933. The court explained the impact on the first element, *i.e.,* the agreement to be married:

> A finding that there is legally and/or factually sufficient evidence of cohabitation and public representation will not necessarily constitute

17

legally and/or factually sufficient evidence of an agreement to be married. <u>There must also be legally and/or factually sufficient evidence of an agreement to be married</u> which may include direct and/or circumstantial evidence. [emphasis added]

*Id.* at 933.

As the proponent of an informal marriage, Cynthia bore the burden of proof to establish all three elements of informal marriage, including an agreement to be married, by a preponderance of the evidence. *Burden v. Burden,* 420 S.W.3d at 309; *Lewis v. Anderson,* 173 S.W.3d 556, 559 (Tex.App.–Dallas 2005, pet. denied).

The plain language of the statute provides a partial order for establishing each element. The agreement to be married must be established first in time, because living together as husband and wife and representing marriage to others occur "after the agreement." TEX. FAM. CODE § 2.401(a)(2). Case law instructs that an informal marriage does not exist until the concurrence of all three elements. *Id.*; *see also Winfield v. Renfro,* 621 S.W.2d 640, 646 (Tex.App.–1991, writ denied).

**C.** ***The evidence is legally and factually insufficient to prove that Cynthia and Frank entered into an agreement to be married.***

The trial court's findings of fact do not provide a date upon which the parties entered into an agreement to be married. Instead, the court found that an agreement occurred on or before April 27, 2002, and the parties were informally married by April 27, 2002. [Finding No. 3, No. 26, at CR 224-25] The element of

18

an "agreement" must be independently established by legally and/or factually sufficient evidence; it must occur first in time, after which living together in Texas and holding out in Texas must be established; and, the agreement cannot be tacit, implied, or inferred, simply because there is some evidence of living together in Texas and holding out in Texas.

To establish the element of "agreement," Cynthia had the burden to prove that she and Frank agreed to be husband and wife and they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that could be ended by either party. *See Burden v. Burden,* 420 S.W.3d at 308; *see also Winfield v. Renfro,* 821 S.W.2d at 645. While a common law marriage is a marriage without formalities, the lack of formalities does not mean that a party can unilaterally make the agreement to enter into the state of matrimony, with the other party left unaware that an "agreement" has been made. *See, e.g., Gary v. Gary,* 490 S.W.2d 929, 932 (Tex.Civ.App.–Tyler 1973, writ ref'd n.r.e.) (an agreement necessary to create common law marriage must be specific and from both sides); *see also Tompkins v. State,* 774 S.W.2d 195, 208 (Tex.Crim.App. 1987)(claim of common law marriage is closely scrutinized and ". . .requires that the agreement to become husband and wife should be established by a preponderance of the evidence showing that the agreement was to be specific on both sides."). In *Lewis v.*

19

*Anderson,* the court explained that the issue was not whether the wife/proponent of the marriage had agreed to be married, but rather, whether the wife/proponent of the marriage had presented some evidence that the husband also agreed to be married. *Id*., 173 S.W.3d at 560.

Frank testified that he has never had any agreement with Cynthia to be married following their March 29, 2001 divorce. [RR 3: 97]

Cynthia's evidence on"agreement" includes her own trial testimony and her pleadings. Cynthia's evidence does not meet the requirements for mutuality of an agreement, one that is shown to be specific for both sides. Cynthia alleged:

- In Cynthia's Original Petition for Divorce, filed on October 3, 2011, she alleged that she and Frank were married on or about May 2001 [CR 10]. This marriage date would be impossible under the law because the evidence in the case showed that Frank left Texas on March 29, 2001, and did not return until December 2001.

- The following year Cynthia filed another Original Petition for Divorce on August 3, 2012. She alleged that she and Frank had married on or about February 7, 2000 [CR 21]; this marriage date would be impossible under the law because Cynthia and Frank were still ceremonially married at the time.

- Cynthia's First Amended Original Petition for Divorce alleges that the parties were married on or about April 29, 2001 [CR 42]. Again, this date is impossible under the law because Frank left Texas in March 2001 and did not return until December 2001.

- The Second Amended Petition for Divorce alleges that on March 29, 2001 (immediately after the divorce), Cynthia and Frank were together at the Taste of Heaven restaurant where they held each other out as husband and wife, cohabited in Texas, and intended to be married. [CR 84] This allegation is

incapable of performance; Frank left Wharton immediately after the hearing.

- Frank denied the March 29, 2001, as alleged by Cynthia.   He testified that he flew to Texas from California; he stayed at a hotel in Houston the night before the divorce hearing; he and his California attorney were picked up the day of the divorce hearing by his present counsel and then driven to Wharton; he did not see Cynthia at the courtroom and did not see her at the Taste of Heaven restaurant. [RR 3: 94-97]

Not only are Cynthia's pleading allegations contradictory, they are not supported by any probative evidence of an agreement made by Cynthia and Frank to enter into marriage.  Cynthia's pleadings, and the abandoned pleadings, can be used as evidence against her. *See Valdez v. Barrera,* 647 S.W.2d 377, 382 (Tex.App.–San Antonio 1983, no writ).  The pleadings were statements seriously made, and they contain statements which were revealed to be false when viewed in light of later testimony as Cynthia developed her theories and built her case.

Frank filed Special Exceptions in which he objected to Cynthia's late-filed Second Amended Petition. [CR 95-97] He especially excepted to the variety of dates alleged by Cynthia, her shotgun approach by listing a number of different dates, events, and times, without declaring one specific date.  The court carried all motions in this case, and all motions were overruled at the conclusion of the case. [RR 6: 63]

Cynthia testified that it was her memory that she and Frank had lunch right after the divorce, and immediately began the common law marriage.  She stated the common law marriage started as soon as the divorce was final. [RR 3: 13-14]  Then,

21

she testified that since March 29 was the day of divorce, the common law marriage would begin the day after, and further testified: "I don't know what the – I think it would be the day after, wouldn't it, or the same day." [RR 3: 15] She further testified that she knew the elements of common law marriage, and she thinks she made a mistake when she alleged February 7, 2000 as the date of a common law marriage in an earlier pleading. [RR 3: 85-86]

Cynthia seemed to have settled on March 29, 2001, or the day after, as the date when she and Frank got married again in a common law marriage. Cynthia testified that nothing changed in their relationship. [RR 3: 13-14] Cynthia's testimony does not support an agreement to be married. *See Burden v. Burden,* 420 S.W.3d at 308 (where the proponent spouse's testimony concerning her belief that she and her husband were in a marriage relationship and that nothing had changed, was found <u>insufficient</u> evidence to establish an agreement to be married). Under the authority of *Burden v. Burden,* Cynthia's evidence is "no evidence."

In an effort to shore up her testimony of "agreement," Cynthia also testified she believed she was married to Frank because she loved him; she believed they were married because they had a lot of things in common like "law" and the "entertainment business"; she was still married to Frank after March 29, 2001 because they continued to share their lives; and, she intended to be married to Frank. [RR 2: 349-50] This

22

testimony fails to describe how or when she and Frank entered into an agreement to be married at common law. The law governing informal marriages required Cynthia to present specific evidence of a mutual agreement to enter into marriage. She was unable to do so.

It would not be a difficult task to present such evidence, if indeed the parties had made such an agreement. For example, in *Winfield v. Renfro*, Sandra Renfro remembered and testified to April 11, 1982, as a date certain when the parties agreed to be married while Dave Winfield was in Dallas playing in a baseball game. *Winfield v. Renfro*, 821 S.W.2d at 645. In *Lewis v. Anderson,* Mindy Anderson testified to specific facts concerning the agreement to be married, including a renewal of the agreement every year for twenty years and an annual anniversary celebration of the agreement. *Lewis v. Anderson,* 173 S.W.3d 556, 560 (Tex.App.–Dallas 2005, pet. denied).

Because there was no agreement between Cynthia and Frank, there was no anniversary or specific date to celebrate. There is not a single card, letter, email, taped telephone conversation or any other indicia that Frank and Cynthia celebrated an alleged second marriage. The absence of any such evidence is particularly revealing when considered in light of the vast store of Valentine cards sent by Frank and saved by Cynthia. [See, for example, RR 9: PX 61- PX 66] Significantly, the

23

record contains an anniversary remembrance of the 1998-2001 marriage.  In 2008, and in remembrance of what would have been their 10th wedding anniversary, Frank sent Cynthia flowers, marking the date of their marriage ten years earlier on October 15, 1998. [RR 2: 61; RR 8: PX 18 at PDF 143]  In contrast, there are no anniversary gifts or cards or flowers marking a date and celebrating a common law marriage agreement.

Still further, Frank contends that the terms of the 2001 divorce decree, and Cynthia's acceptance of spousal support payments for the full two year term (until the end of March 2003), support a logical and reasonable inference that he and Cynthia had not agreed to remarry on the date she now claims in this lawsuit.  Had Cynthia and Frank remarried, the spousal support payments would have terminated. [This Brief, *supra,* at pp. 3-4;  RR 8: PX-1, App. 2, p. 8 ¶ 6.2B]

This record shows a complete absence of the vital fact of a mutual agreement by the parties to become married again.  Indeed, Cynthia's claim that she and Frank entered into a common law marriage on the very same day that she and Frank were divorced by the Final Consent Decree of Divorce is, of itself, shocking and strains credulity.

**D.** *The evidence is legally and factually insufficient to prove that Cynthia and Frank lived together in this state as husband and wife.*

As the proponent of common law marriage, Cynthia was also required to prove that <u>after the agreement they lived together in this state as husband and wife.</u> Cynthia's live pleading and trial testimony finally settled on March 29, 2001, or perhaps the next day, as the date when the common law marriage began and their relationship continued thereafter. [CR 84 ¶¶ b.c.d.; RR 3: 13-15] The trial court made findings that a marriage agreement occurred on or before April 27, 2002, and the parties lived together in Texas as husband and wife on or before April 27, 2002.

At the outset Frank notes that there are impediments to Cynthia's claim and the trial court's findings: (1) Cynthia could not have been married to Frank prior to March 31, 2003, because she continued to accept spousal support payments per the divorce decree, and the payments would have terminated had she remarried; [RR 8: PX-1, App. 1, p. 8 ¶ 6.2, B(2)] and, (2) Frank left Wharton the day of the divorce and did not return to Texas until December, 2001, some eight months later. [RR 2: 54, 68] Integral to the element of agreement is the intendment of the parties to create <u>an immediate and permanent marriage relationship in Texas.</u> *See Burden v. Burden,* 420 S.W.3d at 308; *see also Winfield v. Renfro,* 821 S.W.2d at 645. Frank and Cynthia could not have entered into any immediate, permanent cohabitation in Texas after March 29, 2001, because Frank was living in California. He did not visit Texas

25

until December 2001. [RR 2: 68]

As a third impediment to Cynthia's claims of a common law marriage on or about March 29, 2001, and the trial court's findings of common law marriage on or before April 27, 2002, the excessive variances between the times pled by Cynthia as the date of marriage and the evidence offered at trial preclude a finding of marriage on April 27, 2002. A similar situation was addressed in *Winfield v. Renfro.* One of Winfield's issues on appeal was the time variance between the date pled by Renfro (and included in the court's charge) and the proof that was introduced at trial. *Id.* at 646. Renfro had alleged that the marriage to Winfield occurred on April 11, 1982 which meant that all informal marriage requirements would have had to occur on or about that date. The requirements could not be met on April 11 because Winfield did not return to Texas until August, 1982. The court noted the variance between Renfro's pleading and the proof and then stretched the allowable time frame to four months. *Id.* at 646-47.

In our case, Cynthia testified to marriage on March 29 or March 30, 2001, and her pleadings alleged March 29, 2001. The marriage could not have met the requirements for living together in Texas as husband and wife and representing to others that they were married, until April 2002. The variance is excessive. The trial court should not have based its findings on any evidence that was thirteen months

26

past the time supported by Cynthia's pleading. At the most rudimentary level, the court's findings, conclusions, and final decree of divorce violate Rule 301, Texas Rules of Civil Procedure, and should be reversed. *See* TEX.R.CIV.P. 301 (stating in part "The judgment of the court shall conform to the pleadings. . . .")

The following evidence is relevant to the issue of ". . .<u>lived together in this state as husband and wife</u>. . . ."

- Frank has never lived in Texas. He has always lived in California. [RR 3: 93] Cynthia admitted that Frank has always lived in California. [RR 3: 54; RR 5: 52]

- Frank does not vote in Texas. He does not have a Texas Drivers' License. [RR 3: 102] His residence is located at 9706 Hensal Road in Beverly Hills, California. [RR 24: RX-41, RX-42, RX-43]

- Since March 29, 2001, Frank has made trips to Texas to visit Cynthia. He estimates he made 6 trips a year to visit Cynthia. During the holiday season he would alternate Thanksgiving and Christmas holidays between Wharton and California. [RR 3: 102]

- Esther Wormley, the housekeeper at Cynthia's home, testified that Frank did not come to visit every month. She further testified that his longest visit was a week, maybe two weeks at the holidays. [RR 2: 265, 267] When he was in town, he used Cynthia's car. [RR 2: 263] Frank did not keep a lot of clothes at the house, just house shoes, shirts, maybe a jacket. [RR 2: 266]

- Donna Kubesch, Cynthia's friend, testified that Frank visited Cynthia 10 times a year, but that is only her estimate, and she based the estimate on information she received from Cynthia's sister. [RR 2: 43, 44, 46]

- Cynthia claimed that Frank came to Texas 2 to 3 times a month, sometimes one time a month. [RR 3: 78] Cynthia's testimony stands alone, uncorroborated by any of her own witnesses, or by supporting documentation.

27

- Cynthia's daughters and her mother did not testify in the case.

- O'Connor testified that California is Frank's primary residence, and it is his domicile for taxes. Frank spends over 182 days a year in California. [RR 2: 290] O'Connor prepares Frank's tax returns as a single taxpayer with his residence in California. [RR 2: 275] O'Connor communicated with Cynthia's CPA concerning Cynthia's filing status as "head of household" which applies to unmarried persons with dependents. In response to Stephenson's and Cynthia's concerns over whether Frank was paying gift tax, O'Connor assured them that monies to Cynthia were gifts and Frank was filing gift tax returns. [RR 2: 277-281]

- Cynthia's current home at 1913 Kelving Way, Wharton, TX, was purchased in 2005. Frank went on the note with Cynthia so she could obtain the mortgage. Cynthia is listed on the Warranty Deed and Deed of Trust as Cynthia W. Sinatra, a single person. Frank is listed as Frank W. Sinatra, a single person. Frank also loaned Cynthia $40,000 to assist her in the purchase of Kelving Way. [RR 22: RX- 21, RX-22, RX-33; RR 2: 109-110; RR 3: 123]

- Frank did not have a key to the Kelving Way house and did not consider it his house; it was Cynthia's house which he helped her to obtain. Cynthia referred to the house as "my home." [RR 3: 22-23, 25, 27] Cynthia considered Frank's trips to Texas as "a visit," not a return home. [RR 3: 52-53, 103; RR 24: RX-38]

Frank did not live in Texas at any time. Frank visited Cynthia in Wharton; he had to borrow her car to get around; he did not even have a key to the residence; his business and financial affairs are based in California; upon receiving two separate diagnoses of cancer, he did not seek or receive medical treatment in any Texas medical facility; he did not give a Texas address as his residence on Federal or California tax returns; he would not have subjected himself to California's state

28

income taxes had he lived in Texas; and he spent the majority of his time in California or on tour with his music business. While there is evidence that Frank traveled to Texas to visit with Cynthia and her daughters after the March 29, 2001 divorce, that evidence is not probative on the vital issue of living in Texas as husband and wife with Cynthia.

**E.** ***The evidence is legally and factually insufficient to prove that Cynthia and Frank held out as husband and wife in a non-social context such as financial and legal matters; any references to "husband" and "wife" occurred in a social context.***

Frank does not dispute the fact that he referred to Cynthia as "wife," and she referred to him as "husband" following their 2001 divorce. The record contains testimony and exhibits showing Frank's references to Cynthia as "wife." The context of those references is important, as it affects this Honorable Court's review of the entire record. Therefore, Frank begins by stating that all the references to Cynthia as wife were made in a social context or a social setting, and none were made where legal or financial ramifications could flow to either Frank or Cynthia.

Frank described Cynthia as the "love of his life." She is the only wife he had ever known, and due to that singular position in his life and out of respect and devotion to her, he continued to refer to her as "wife" following their divorce. [RR 2: 55, 57, 75, 78, 91-92, 118, 125, 130, 134, 141; RR 3: 119] When Cynthia's counsel questioned him throughout the trial on his references to Cynthia as "wife," and why

29

he referred to Cynthia as "wife," he explained:

- "This is the only woman I was ever married to . . . . .She had that place in my life . . . She had that place in the history of my life." He would not call her 'former wife,' because "I would not insult her." [RR 2: 92]

- "I didn't care to embarrass her with explanations to people to whom it was no one's business if we were still married or not." [RR 2: 118]

- "She was the only woman I ever married and whether we were still married or not, the fact of the matter is this card was written like that." [RR 2: 119]

- He sent cards that sometimes stated bride, or wife, or partner, or friend. He sent them out of sentimentality and he still had feelings for Cynthia. [RR 2: 125, 130, 133]

Cynthia also presented evidence emanating from invitations, her law school, envelopes, contributions, purchase of cemetery plots, the community theater, purchase of wine lockers, membership in Houston Club, and Wharton Country Club, all of which contained references to Mr. and Mrs. Frank Sinatra. [See, for example, RR 8: PX-2, PX-3, PX-5,PX-25, PX-26, PX-35; RR 9: PX-43, PX-53-56, PX-69, PX-70] All of these materials were generated by the organizations, and as the result of unilateral activity initiated by Cynthia. Frank had no input. [RR 2: 147, 172-74, 178, 183, 186, 200-201]

Throughout the period of the alleged common law marriage, both Frank and Cynthia continued to represent "single" status on documents that had any legal or financial significance. For example, Frank filed all 1040 tax returns with his filing

status shown as "single." [1040 Tax Returns for years 2003 - 2011 at RR 22: RX-11 through RX-19] The gift tax returns identify Cynthia as his "ex-spouse." [RR 22: RX-1 through RX-8]

The Francis W. Sinatra Trust (Dated June 15, 1998) Restated September 20, 2005, provides that the Settlor (Frank) is not married. [RX-45, p.5 ¶ 1.3] When describing distributions from the trust estate on settlor's death, the Trust provides for a percentage distribution to "my former wife CYNTHIA W. SINATRA. . . ." [RX-45, p. 11 ¶ 5.3(a)(1)]

Frank's residence is located at 9706 Hensal Road in Beverly Hills, California. The Deed of Trust for the Hensal Road home is signed by "Francis Wayne Sinatra as Trustee of the Francis W. Sinatra Trust, dated June 15, 1998." Likewise, the Grant Deed lists the grantee as "Francis Wayne Sinatra, Trustee of the Francis W. Sinatra Trust, dated June 15, 1998." [RR 24: RX 41, RX 43]

The Warranty Deed for Cynthia's residence located at 1913 Kelving Way Court in Wharton lists the grantees as "Cynthia W. Sinatra, a single person, and Frank W. Sinatra, a single person." [RR 22: RX-21]

Cynthia filed her 1040 tax returns with her filing status shown as "head of household." [RR 23, which contains RX-28, Cynthia's tax records]

These forthright assertions by both Frank and Cynthia constitute probative

31

evidence that the parties were not married. Cynthia did not hold herself out as a married woman, or as Mrs. Sinatra, when she filed her tax returns and when she was signing the closing documents on her home at Kelving Way Court. Cynthia is a licensed attorney who repeatedly claimed and presented herself in legal documents as a single woman. This undercuts her claim that she and Frank had agreed to embark on a second marriage. *See, c.f., Lewis v. Anderson,* 173 S.W.3d at 562 (where the protesting spouse had been willing to sign adoption papers as a married person, he could not then contest proponent wife's claims of common law marriage). It is logical and reasonable to conclude that Cynthia knew she was not a married person.

Cynthia was required to prove all three elements of common law marriage by a preponderance of the evidence; no element can be established by implication. The record shows a complete absence of probative evidence that Frank and Cynthia entered into an agreement to be common law married. Even if the Honorable Court were to find Cynthia's testimony as "some evidence," Cynthia's contradictory testimony, allegations, and scenarios proposed by her cannot be reasonably or logically reconciled. Because there is no evidence and factually insufficient evidence of the first and second elements of common law marriage, and because the evidence on the third element shows the non-existence of a marriage when it is considered in historical context of the parties' relationship, the entire common law

32

marriage claim must fail.

## II.   Issue Two

**Because the evidence was legally and factually insufficient to support the community property character of the Hensal Road home and the funding into the trust's bank account which purchased the home, the trial court erred when it failed to confirm the Francis W.  Sinatra Trust as Frank's separate property, when it  mischaracterized the funds that had purchased the Hensal Road house as community property, and when it awarded one-half of the Hensal Road house to Cynthia.**

### A.   *Introduction*

Frank inherited substantial assets from the estate of his father, the late Frank Sinatra, Sr.[3]   As a result of the trial court's rulings, findings of fact, and Final Decree of Divorce, Frank has been divested of a portion of his inheritance.  The trial court awarded Cynthia one-half of Frank's California home which had  been wholly purchased with Frank's share of proceeds arising from the 2007 sale of a portion of the assets inherited from Frank Sinatra, Sr.

Shortly after his father's death, Frank established the Francis W. Sinatra Trust, dated June 15, 1998, Restated September 20, 2005.  ("FWS Trust") [RR 24: RX-45] When Frank and Cynthia were divorced in 2001, Cynthia stipulated to the separate property character of Frank's assets and waived all claims to Frank's assets.  [RR 8: PX-1; CR 52-79, at pp.  2-3 Article Two, ¶ 2.1 at A. - J., Schedule A]  In her

---

[3]      Frank Sinatra, Sr.  died on May 14, 1998.

33

Inventory, and again at trial, Cynthia stipulated to the separate property character of Frank's assets, listed in her Inventory at lines 78-102 [CR 212-13]. Even though Cynthia had waived any and all past or future claims to the assets in the 2001 divorce decree and had also stipulated to the separate property character of the assets at trial, Cynthia withdrew her stipulation at the end of trial. Inexplicably, and in contravention of established rules and trial practice in Texas courts, the court allowed her to do so.

In this issue, Frank contends that the evidence is legally and factually insufficient to support the trial court's findings of fact, and the trial court thereafter abused its discretion in rendering its judgment in the Final Decree of Divorce which divested Frank of his separate property.

As a subsidiary point within this Issue, and directly relating to the Issue, Frank contends that the trial court abused its discretion when it allowed Cynthia to withdraw her separate property stipulation after Frank had closed, because Frank had tried his case under Cynthia's stipulation which conceded, agreed, and admitted that Frank's trust was his separate property.

B.    *Standard of Review*

This Honorable Court requires a party complaining of a trial court's characterization of property to first establish error by challenging the legal or factual

sufficiency of the evidence to support the characterization, and must then conduct a harm analysis to show that because of the mischaracterization, the overall division of property constitutes an abuse of discretion. *See Davila v. Davila,* 2013 WL 5305883, * 2 (Tex.App.–Corpus Christi 2013, pet. denied)(mem.op.), *citing Viera v. Viera,* 331 S.W.3d 195, 207 (Tex.App.–El Paso 2011, no pet.). [4]

Standards for reviewing legal sufficiency and factual sufficiency have been set out in this Brief at ¶ I. A., *supra*. In this Issue Two which concerns trial court error in mischaracterizing Frank's separate property as community property, a somewhat higher standard is applied because Frank's burden of proof at trial was by "clear and convincing evidence." The Texas Constitution defines "separate property":

> All property, both real and personal, of a spouse or owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse. . . .

TEX.CONST. art. 16 § 15. The statutory enactment is found at TEX. FAM. CODE § 3.001.

"Community property" consists of the property, other than separate property, acquired by either souse during marriage. TEX. FAM. CODE § 3.002. There is a presumption that all property on hand at the time of divorce is community property.

---

[4] Frank's harm analysis and the effect of mischaracterization within the overall division is included at Issue Four, where the mischaracterization and money judgment are considered.

TEX. FAM. CODE § 3.003.

In order to overcome the community property presumption, Frank was required to establish the separate property character of the FWS Trust and its assets by clear and convincing evidence. TEX. FAM. CODE § 3.003(b); *McElwee v. McElwee,* 911 S.W.2d 182, 188 (Tex.App.–Houston [1st Dist.] 1995, writ denied). Clear and convincing evidence is defined as the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE § 101.007; *Moroch v. Collins,* 174 S.W.3d 849, 857 (Tex.App.–Dallas 2005, pet. denied)(explaining further: ". . . but the evidence need not be unequivocal or undisputed.").

**C.** ***Cynthia's stipulations as to Frank's separate property were judicial admissions and relieved Frank of any burden to present further proof. When the court allowed Cynthia to withdraw her stipulation at the close of evidence, Frank suffered clearly prejudicial harm.***

In addition to the agreements and waivers contained in the parties' 2001 divorce decree, Cynthia acknowledged in her trial inventory that Frank's assets listed at Lines 78-102 were his separate property. [PX-100] At trial, Cynthia stipulated that the assets listed at 78-102 were Frank's separate property. [RR 4: 99] During cross examination of Cynthia's expert witness, the question was posed:

> Q.     If I understand your testimony correctly, Mr. Gerhardt, Ms. Sinatra is basically stipulating that all the items listed on – and this on your inventory – listed on Lines 78 through 102 are Mr. Sinatra's separate property?

36

A.      That's my understanding.  I mean, those came off the previous divorce decree.

Q.      Okay.  So I'm just asking so we can possibly save some time in this case, you're stipulating that those are Mr.  Sinatra's separate property?

A.      I can't stipulate.

MR.  MAHER:      We stipulate they are.

MR.  COLE:      I'm sorry?

MR.  MAHER:      We stipulate they are.  Line 78 –

MR.  COLE:      Through 102?

MR.  MAHER:      Yes. [5]

A.      It's beyond my pay grade.

[RR 4: 98-99]   Cynthia's stipulation that  Lines 78 - 102 were separate property wholly met and satisfied the burden of proof to establish the separate property character of those assets.  A stipulation is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto.  *Shepherd v.  Ledford,* 962 S.W.2d 28, 33 (Tex.  1998).   A stipulation constitutes a contract between parties and between the parties and the trial court.  *Gulf Construction Co.  Inc.  v.  Self,* 676 S.W.2d 624, 630 (Tex.App.–Corpus

---

[5]      There is no indication in the trial testimony that the trial court refused to accept the stipulation when it was offered.

Christi 1984, writ ref'd n.r.e.)(generally, valid stipulations are binding on the parties and on the trial court.)

Not only did the stipulation relieve Frank of his burden to prove the separate property character of assets at trial, it also estopped Cynthia from claiming to the contrary. *See, e.g., id.; see also Bomar Oil and Gas, Inc. v. Loyd,* 381 S.W.3d 689, 693 (Tex.App.–Amarillo 2012, pet. denied)(the stipulation becomes conclusive as to the facts conceded).

At the end of the trial, after Frank rested, and the court questioned "Both sides rest and close?" Cynthia's counsel stated that he had one more thing, in rebuttal. His rebuttal was actually the withdrawal of her stipulation as to the FWS Trust, stating it was based upon testimony of O'Connor, commingling of funds, and "confusion" as to who the trust actually was. [RR 6: 39] Cynthia's counsel vehemently opposed the withdrawal, noted that the withdrawal of the stipulation was not a form of rebuttal, but an effort to reopen evidence, and that his expert had testified the day before and had left. [RR 6: 40] In response to Cynthia's complaint that there were no bank records, no testimony, Frank argued that he had been relieved of any burden to put on detailed evidence, pointing out "there was a stipulation." [RR 6: 43] Nonetheless, the court ruled: "...I'm going to allow you [Maher] to withdraw your stipulation as to the Frank Sinatra 1998 trust...." [RR 6: 44] Cynthia's withdrawal

38

of her stipulation, and the court's subsequent ruling, all occurred at a time when Frank had tried his case based on the stipulation, and closed.

Cynthia's disingenuous "strategy" should not have been rewarded with the court's ruling. She had allowed the trial to go forward with her stipulation on record, to the end that Franks's case was presented in "shorthand" because he no longer had a burden to prove the separate property character of his assets, listed at Lines 78-102. In permitting this ambush to succeed, and in ruling in favor of outrageous trial tactics which contravene well-settled rules concerning the binding nature of a stipulation, the trial court's ruling was clearly prejudicial, capricious, and arbitrary, all of which constitutes an abuse of discretion. *See, e.g., Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985)(abuse of discretion occurs when trial court's decision deviates from guiding rules and principles and is otherwise arbitrary, capricious, and unreasonable.); *see also Parr v. State,* 2014 WL 69567, * 3 (Tex.App.–Corpus Christi 2014, no pet.)(mem.op.)(the inquiry on appeal is whether the result was reached in an arbitrary and capricious manner).

**D.** ***Applicable rules for separate and community property.***

The court entered findings of fact which erroneously characterized the Francis W. Sinatra trust and funding into its bank account. [CR 224-25, Nos. 7, 14, 16, 28] Texas courts have developed a number of rules which are applicable to the

characterization issues found in this case.

- The characterization of property as community or separate is determined by the inception of title to the property, *i.e.*, when a party first has a right of claim to the property by virtue of when the title is finally vested. *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex.App.–Fort Worth 2004, no pet.); *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex.App.–Houston [14th Dist.] 2003, pet. denied).

- Because it is presumed that all property possessed at time of divorce is community property, the party claiming separate property must trace and clearly identify the property claimed as separate. *See Estate of Hanau v. Hanau,* 730 S.W.2d 663, 667 (Tex. 1987); *Smith v. Smith*, 22 S.W.3d 140, 144 (Tex.App.–Houston [14th Dist.] 2000, no pet.).

- Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Zagorski v. Zagorski*, 116 S.W.3d at 316. As long as separate property can be definitely traced and identified, it remains separate property regardless of the fact that it my undergo mutations and changes. *Welder v. Welder,* 794 S.W.2d 420, 425 (Tex.App.–Corpus Christi 1990, no writ).

- A showing that community and separate funds were deposited in the same account does not divest the separate funds of their identity and establish the entire amount as community when the separate funds may be traced and the court is able to determine accurately the interest of each party. *Id.*

    **E.    *Measuring the record evidence against the rules governing characterization shows the evidence is legally and factually insufficient to support the trial court findings.***

        1.    The Francis W. Sinatra Trust (FWS Trust) was created in 1998

and was amended and restated in 2005. [RR 5: 85-6; RR 24: RX-45]

        2.    There is no source of income that is not reported by either

Anomaly or the FWS Trust. [RR 5: 89-90, 94]

3. Frank's trust is a living revocable trust. The trust will become irrevocable on Frank's death. [RR 5: 90-93]

4. O'Connor is responsible for disbursing all funds and writing all the checks on the trust's bank account. [RR 5: 91]

5. Frank's separate property included Bristol, Essex, and Sheffield.[6] Bristol held the reprised masters and movies; Essex held the Capital Records catalog; Sheffield had intellectual properties, name, likeness. All of these assets had been earned by Frank Sr. Bristol, Essex, and Sheffield had been set up by Frank Sr. for his children, long before his death. [RR 5: 97-98]

6. The owners of Bristol, Essex, and Sheffield were Frank, his son Michael, his two sisters Nancy and Tina, Nancy's two daughters, and two of Frank Sr.'s long time business associates. In 2007 Bristol, Essex, and Sheffield were folded over into FSE Holdco. [RR 5: 103; RX-49, RX-50] Holdco then contributed all of the masters, likenesses, and TV shows into another new entity called Frank Sinatra Enterprises (FSE). [RR 5: 97-99; RX-43, RX-49, RX-50] There are two separate entities, FSE (Frank Sinatra Enterprises) and FSE Holdco. The owners of the new entities remain as they were under Bristol, Essex, and Sheffield. [RR 5: 100-103]

---

[6] Those entitles had been part of the Somerset trust, which was part of Sinatra, Sr.'s estate. [RR 5: 92-93, 97]. Cynthia did not challenge the characterization of Bristol, Essex and Sheffield. [Inventory, lines 81-84, PX-1; CR 212]

7.     The Holdco transaction, which included the sale of ½ of FSE assets to Warner Music, generated capital gains for the interest owners in FSE Holdco, which included Frank.  Frank's share of the sale proceeds was reported on his 2007 tax return as $12,367,795.  [RR 22:  RX-15, p.  1]

8.     The closing date for Holdco's asset sale to Warner Music was November 19, 2007.  [RR 5: 103] Frank realized proceeds in the amount of $10.1.  The proceeds were deposited directly into Frank's trust account.  [RR 5: 112-13; RR 6: 32-33]  On December 21, 2007, the Francis W.  Sinatra Trust closed on the purchase of 9706 Hensal Road.  The December 21, 2007 payment for the $4.1 million purchase price for Hensal Road came from the same trust account that had received the November 19, 2007 deposit resulting from the sale of ½ of FSE Holdco assets to Warner Music.   The purchase funds were sent by wire transfer.  [RR 5: 96, 113]  In 2007, and at the time of the Holdco deal and the Hensal Road purchase, the trust account did not contain any remnants of monies that could be considered community property.  [RR 5: 102, 113; RR 25: RX-52] [7]

9.     As financial manager for Frank's affairs, O'Connor participated

---

[7]     A review of Frank's exhibit, RX-52, has a column entitled "Remaining Com $$," which refers to the monies that would have been community property if the parties were married. At the end of 2007, and computing the totals for 2003-2007, the trust account bank balance for "community" monies was a negative.  The monies paid to Cynthia, or for her benefit, exceeded the amount of any "community" funds.

in the Hensal Road transaction. O'Connor testified the purchase payment was made by wire transfer, and the funds came from Frank's trust account, the same account that had received the proceeds on November 19, 2007. [RR 5: 95-97, 113; RR 27: Closing Statement at RX-77] The Closing Statement on the purchase is dated December 21, 2007, the Buyer is identified as "Francis W. Sinatra Trust, dated June 15, 1998," and Total Consideration is $4,100,000.00. The Deed of Trust for the Hensal Road home is signed by "Francis Wayne Sinatra as Trustee of the Francis W. Sinatra Trust, dated June 15, 1998." The Grant Deed lists the grantee as "Francis Wayne Sinatra, Trustee of the Francis W. Sinatra Trust, dated June 15, 1998." [RR 24: RX 41, RX 43]

Even though Cynthia's stipulation was withdrawn, Frank requests the Court to take note of the withdrawn stipulation. Frank contends that under the stipulation there was no necessity to prove up the separate property character of his trust, which necessarily included the trust's bank account, and the home purchased by the trust.

O'Connor's testimony and exhibits, taken together with Cynthia's remaining stipulations as to Bristol, Sheffield, and Essex, show that Frank's right to the assets came to him by inheritance from his father. Bristol, Sheffield, and Essex had been set up by Frank Sr. Frank was one of the named interest owners in Bristol, Sheffield, and Essex. Frank's right to the property vested when his father died in 1998. Under

43

inception of title, those assets which he inherited from his father remain Frank's separate property so long as he can trace and clearly identify the property through mutations and changes. TEX. FAM. CODE § 3.001; *see generally, Boyd v. Boyd,* 131 S.W.3d at 612; *Zagorski v. Zagorski,* 116 S.W.3d at 316.

The property was traced through changes and was clearly identified through the testimony of Randal O'Connor. O'Connor's testimony was supported and corroborated by the following: Frank's income tax returns; the documents showing that the Bristol, Sheffield, and Essex entities were folded into FSE Holdco; the Holdco agreement which follows Frank's property interest from Bristol, Sheffield, and Essex into Holdco and FSE Holdco; the sale to Warner Music; the amount of the sale proceeds from the Warner Music transaction which are identified on Frank's tax return and deposited into his trust's bank account from which the $4.1 million wire transfer paid for the home; and the Hensal Road statements and deeds. [Record references in detail at ¶ II., E., 1 - 9, *supra*]

The court found, however, that the funding of the trust account with sale proceeds from FSE Holdco, which are clearly Frank's separate property having been inherited from his father and remaining separate through a series of holding company transactions, did not "operate to convert community property of the parties into the separate property of Francis Wayne Sinatra." [CR 212] While one cannot be certain,

44

it appears that the court found the November 19, 2007 deposit became community property upon deposit, and the house purchased with the "community property" funds on December 21, 2007, was thereafter awarded to both Cynthia and Frank.

Our law does not require such an inequitable and harsh result. In fact, this Court has addressed the precise question:

> A showing that community and separate funds were deposited in the same account does not divest the separate funds of their identity and establish the entire amount as community when the separate funds may be traced and the trial court is able to determine accurately the interest of each party.

*Welder v. Welder,* 794 S.W.2d 420, 425 (Tex.App.–Corpus Christi 1990, no writ). In our case, the exact amount of funds derived from the sale of ½ of FSE assets was known. The exact amount of funds that were wire transferred, one month later, to purchase the Hensal Road home was known. Under similar facts as to deposits and expenditures, the Amarillo court held that the requirements of tracing the husband's separate property proceeds from the sale of real estate had been met. *See In the Matter of the Marriage of Tandy,* 532 S.W.2d 714, 717 (Tex.Civ.App.–Amarillo 1976, no writ)(the exact amount of money that went into the account was known and the exact amount of money that came out was known.). As in the *Tandy* case, where the husband's separate funds were traced into, and out of, an account that also held community funds, Frank contends that he has met the requirements of tracing his

45

separate property funds.

The trial court findings that Frank had not met his burden to show separate property character by clear and convincing evidence underscore the prejudicial harm caused by the trial court when it allowed Cynthia to withdraw her stipulation. The stipulation satisfied the burden of proof as to the matter stipulated: the separate property character of Lines 78 - 102, which included Frank's trust. Because of the stipulation as to Frank's separate property, Frank had no requirement during trial to offer further evidence on his separate property.

As a result of these errors, the court's divorce decree mischaracterized 9706 Hensal Road as community property by awarding ½ of the property to Cynthia. This error constitutes an abuse of discretion and requires reversal because Frank has been divested of his separate property. *See generally, Smith v. Smith,* 22 S.W.3d at 147, *citing Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex. 1977); *see also Murff v. Murff,* 615 S.W.2d 696, 698-99 (Tex. 1981).

## III. Issue Three

**The trial court abused its discretion when it ordered Frank to pay Cynthia a judgment in the amount of $500,000 to equalize its division, because there is legally insufficient, or alternatively, factually insufficient evidence to support the court's finding that Frank had possession and control of $1,000,000 in unspent cash and earnings paid to him during marriage.**

### A. *Standard of Review*

As part of its property division, the court entered an equalization judgment in the amount of $500,000. An award of an equalization judgment is within the trial court's discretion. The entry of an equalization judgment is reviewed for legal and factual sufficiency to support findings, which do not stand independently as grounds for reversible error, but instead, are considered as factors on whether the trial court abused its discretion. *See Massey v. Massey,* 807 S.W.2d 391, 398 (Tex.App.–Houston [1st Dist.] 1991), *writ denied with opinion,* 867 S.W.2d 766 (1993).

### B. *There is no evidence to support the finding that Frank has possession and control of at least $1,000,000 in unspent cash which was "not revealed or identified."*

The court's finding that Frank has possession and control of unspent cash and earnings in the amount of at least $1,000,000 seems to be the basis for the court's equalization judgment of $500,000. Frank's evidence shows the finding and judgment cannot rationally be supported by the record. [CR 224-25 at No. 13]

Frank submitted his federal tax returns in discovery [offered by Cynthia at PX-126 through 135]; he also offered his federal 1040 tax returns and federal gift tax returns [RX-1 through RX-8, gift tax returns; RX-11through RX-19 income tax returns]. O'Connor prepared RX-52 which is a summary of all income and expenditures for the 2003-2013 time period. [RR 25: RX-52] O'Connor also prepared RX-53 and RX-54, to show the specifics of revenue and expenses for Francis W. Sinatra Trust / Anomaly LTD, LLC for the time periods preceding trial. (Anomaly is a flow through entity for the Francis W. Sinatra Trust. [RR 5: 85, 89] No assets are held in Anomaly. [RR 5: 109] ) As Frank's CPA, O'Connor prepared tax returns, paid bills, and managed Frank's business and financial affairs. O'Connor was competent to testify concerning the amount and source of income for the trust and the flow-through entity, Anomaly. *See, e.g., Moroch v. Collins,* 174 S.W.3d at 863, *citing Holloway v. Holloway,* 671 S.W.2d 51, 55-56 (Tex.App.–Dallas 1983, writ dism'd w.o.j.)("We know of no authority holding that a witness is incompetent to testify concerning the source of funds in a bank account without producing bank records of the deposits.")

Over the 10-year period summarized in RX-52, and during which time Frank

paid $4.7 million directly to Cynthia or made payments for Cynthia's benefit,[8] an additional sum remained available for Frank's living expenses. Exhibit RX-52 shows a balance of $1,143,492 ("1.1 million") in the "Remaining Com" column. This column reflects the amount that was not paid to Cynthia and which the court apparently believed was remaining in hand, and unaccounted for. In fact, "Remaining Com" shows the amount that had not been paid for Cynthia's expenses and remained available for Frank's expenses over the 10-year period.[9] The total amount available for spending, as derived from the "Remaining Com $$" column and "To C. Sinatra" column was $5,856,152.

Under the community out first rule, courts will presume that community funds are drawn out first, before separate funds are withdrawn. *Sibley v. Sibley,* 286 S.W.2d 657, 659 (Tex.Civ.App.–Dallas 1955, writ dism'd). O'Connor correctly understood the rule to be the "first monies out of accounts are considered community property and separate property is the last monies out." After the expenditure of $4.7

---

[8] O'Connor testified that during the years following the 2001 divorce, the monies paid to Cynthia or for her benefit ($4,712,659) were categorized as gifts, not inter-spousal transfers, because: the parties were not married; he had a copy of the divorce decree; and Frank had not remarried. [RR 2: 275-76, 280-81, 282, 297, 302-03]

[9] RX-52 shows a capital gain for 2007, in the amount of $12,367,795 (before tax), which is not part of the final computation. The gain arose from Frank's share of the sale of a 50% interest in the corpus of Frank Sinatra Sr. assets such as reprised masters, movies, intellectual property, the name, the likeness, and the Capitol Records catalog. [RR 5: 98-104] Frank received $10.1 million into his trust account, and after taxes he netted $7.1 million. [RR 6: 32-33]

million for Cynthia's living expenses and $1.1 million for Frank, the account would become Frank's separate property. *See, Zagorski v. Zagorski,* 116 S.W.3d at 320 ( community funds were depleted by community expenses; the account remained husband's separate account); *Welder v. Welder,* 794 S.W.2d at 426 (where the community's living expenses exceeded what the community income could support, the monies remaining in the account were husband's separate property). O'Connor further testified that there is no income, from any source, that is not reported on Frank's tax returns. [RR 22: RX-52; RR 5: 105-107].

Frank does not maintain a personal banking account; his bills are paid through bank accounts held in the name of the trust, "FWS Trust," or in the name of the flow-through entity, "Anomaly, LLC," all of which is managed by O'Connor and his firm. [RR 5: 117; RR 6: 19][10] Because O'Connor cuts all the checks for Frank, under the FWS Trust or under Anomaly, and manages the bank accounts as part of his responsibilities, he was qualified to testify that there was no accumulation of funds in the FWS Trust or in Anomaly. [RR 2: 273; RR 5: 93-4, 112-13] In April, 2014, a $114,285 cash balance in Anomaly represented the remainder of the funds borrowed

---

[10] A "Convenience Account" was opened in Wharton. It was called Frank W Sinatra Convenience Account, care of Cynthia Sinatra. Frank had no independent recollection of the account. [RR 2: 136-37] However, it was apparently used when Frank transferred monies to Texas to pay expenses on Cynthia's behalf, for example, the note on the Kelving Way property located in Wharton. [RR 8: PX-27 at ¶ (a)]

from Frank's sister. [RR 25: RX-54, p. 2] At trial, O'Connor testified that Frank had $76,000 remaining, and that balance represented money borrowed from Nancy. [RR 5: 115-117]

Under these facts, the court's finding that Frank "has possession and control of unspent cash and earnings paid him. . . and deposited in bank accounts in the name of Francis W Sinatra Trust" in the amount of at least $1,000,000 is not supported by legally sufficient or factually sufficient evidence. Each and every dollar earned by Frank was reported on his tax returns, and the tax returns were in evidence. The tax returns were summarized and offered at RX-52. After paying Cynthia's expenses in the amount of $4.7 million over a 10-year period, with $1.1 million of spendable income remaining for Frank during the same 10-year period, the court's finding of $1,000,000 in unspent cash is wholly without evidentiary support. Frank's legal insufficiency point should be sustained because there is a complete absence of evidence to support a vital fact; all that remains is surmise and suspicion. Even if the Court determined it would conduct a factual insufficiency review, this finding is so clearly wrong and manifestly unjust as to be an abuse of discretion. After creating the "asset," the trial court then ordered Frank to pay Cynthia an equalization judgment in the amount of $500,000. While a trial court has broad discretion, the discretion is not unlimited; there must be some reasonable basis and sufficient facts

in the record to show that the court acted rationally in the exercise of its discretion.

*See, e.g., Zieba v. Martin,* 928 S.W.2d 782, 790 (Tex.App.–Houston [14th Dist.] 1996, no writ); *see also Landon v. Jean-Paul Budinger, Inc.,* 724 S.W.2d 931, 939 (Tex.App.–Austin 1987, no writ)(a determination can be legally unreasonable in the factual-legal context in which it was made).

## IV. <u>Issue Four</u>

**The trial court's mischaracterization of the Hensal Road house as community property, together with the equalization judgment of $500,000, caused the trial court to abuse its discretion in making its property division where the values of the assets and the equalization judgment awarded to Cynthia resulted in a manifestly unfair, unjust, and disproportionate division of the marital estate which is not "just and right" and which is not supported by legally and factually sufficient evidence.**

### A. *Standard of Review*

A trial court has broad discretion in making its "just and right" division of marital estate upon divorce. *Massey v. Massey,* 807 S.W.2d at 398. Frank has challenged the legal and factual sufficiency of the court's findings of fact relating to its characterization of his separate property home as an asset of the community estate (Issue Two) and its creation of a $1,000,000 community estate (Issue Three). Here, Frank challenges the court's finding that its division of community property is "just and right." It is Frank's burden to show that the trial court's division is so unjust and unfair as to constitute an abuse of discretion. *See Welch v. Welch,* 694 S.W.2d 374,

376 (Tex.App.–Houston [14th Dist.] 1985, no writ).

**B.** ***The parties accumulated no community estate during the informal marriage.***

During the time period of the alleged common law marriage (2001 - 2014), the parties did not create a community estate. The "Summary of $$" included wages, interest income, dividend income, Schedule C income, and partnership income. [RR 25: RX-52] The Summary also itemized tax payments, $4.7 million in gifts (which are now inter-spousal transfers by virtue of the court's ruling of marriage), and $1.1 million for Frank. There was no remaining income to accumulate assets into an "estate of the parties."

**C.** ***Court's characterization and equalization created a community estate which could then be divided.***

Undaunted by the reality of a $0-value estate due to extravagant expenditure, Cynthia claimed 9706 Hensal Road was community property. By the court's finding No. 7, and the Decree's ½ - ½ awards to Cynthia and Frank, Cynthia is now due to receive ±$1,000,000 in "community" property from the sale of Frank's home. Cynthia will also receive an additional $500,000 equalization judgment even where there is no property, cash, or earnings that could be referable to the court's finding No. 13. Cynthia has already received $4.7 million during the marriage. Cynthia's value in these items totals $6.2 million.

Measuring Frank's awards by the same yardstick results in an extraordinarily disproportionate division of property. Frank's newly awarded 50% ownership of his separate property home is valued at ±$1,000,000. The remaining community property that was available for his living expenses was $1.1 million. He must pay Cynthia $500,000. Frank nets $1.6 million.

**D.** ***There is no evidence or factually insufficient evidence to support the finding that this division is "just and right."***

Under the general rule for division of property, the Family Code states: "In a decree of divorce . . .the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party . . . ." TEX. FAM. CODE § 7.001. While a division does not have to be equal, when there is a highly disproportionate division, as in this case, one would expect to find fault findings to support the division. There are no fault findings.

The court's mischaracterization of Frank's home (Issue Two) and the creation of a community estate through a finding of unidentified and unrevealed cash (Issue Three) resulted in a division that is not "just and right" and constitutes an abuse of discretion. The court did not divide the estate of the parties with <u>due regards to the rights of each party</u> and instead disregarded Frank.

## V.    Issue Five

**The trial court abused its discretion when it ordered Frank to pay Cynthia $5,000 per month, because the evidence is legally insufficient, or alternatively, factually insufficient to support the statutory prerequisites for spousal maintenance.**

### A.    *Standard of Review*

An award of spousal maintenance is reviewed for an abuse of discretion. Legal and factual sufficiency of the evidence is not an independent ground for error, but is a relevant factor in determining whether the court abused its discretion in awarding spousal maintenance. *See Diaz v., Diaz,* 350 S.W.251, 254 (Tex.App.–San Antonio 2011, no pet.)

### B.    *Statutory provisions*

In relevant part, the Family Code states the eligibility requirements for spousal maintenance:

> 8.051. . . .the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and: . . .
>
> (2)    the spouse seeking maintenance:
>
> (B)    has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs. . . .

TEX. FAM. CODE § 8.051.   The purpose of spousal maintenance is to provide

temporary and rehabilitative support for a spouse whose ability to support herself has eroded over time while engaged in homemaking activities and whose capital assets are insufficient to provide support. *Tellez v. Tellez*, 345 S.W.3d 689, 691 (Tex.App.–Dallas 2011, no pet.); *see also In re McFarland,* 176 S.W.3d 650, 658 (Tex.App.–Texarkana 2005, no pet.). The statute lists factors that are to be considered in making an award of spousal maintenance, such as financial resources, education, employment skills, and earning ability of the spouse seeking maintenance. *See* TEX. FAM. CODE § 8.052. Most significantly to this case, the statute contains a rebuttable presumption that maintenance is not warranted unless the spouse seeking maintenance has exercised diligence in earning sufficient income to provide for her minimum reasonable needs; or in developing the skills necessary to provide for minimum reasonable needs during the time the suit is pending. *See* TEX. FAM. CODE § 8.053.

> ### C. *Distinguishing facts take this case outside the realm of general spousal maintenance considerations*

Cynthia pled for post-divorce maintenance under Chapter 8. The Family Code, Chapter 8, and interpretive case law contain no provisions that can provide for Cynthia's requested monthly maintenance. As will be shown below, Cynthia's expenses remain at very high levels, and her explorations into the real world of work are unrealistic and minimal. She has known since 2008 that Frank could not

56

underwrite her life, [RR 5: 48], and with that knowledge in hand, she has done nothing to improve her job skills, or her marketability, or diversify her legal area of interest into a field that pays money.

1.      Cynthia submitted her financial information sheet which tallied up her necessary monthly expenses as **$16,475**. [RR 21: PX-136; RR 5: 40]

2.      She enjoyed her work at The Hague, admitted it did not pay and that Frank supported her, but she has traveled back to The Hague since January 2012, two or three times, or one time, to take training. [RR 5: 13-14; 53; 65]  She likes international criminal defense law and has her feelers out.  She specialized in international criminal law.  She would like to represent Bashar al-Assad. [RR 5: 65-66]

3.      Although unable to produce any 2012 applications from her file at trial, she stated she had applied to teach at South Texas College of Law and Texas State University. [RR 5: 10, 12]

3.      She has gone to Louisiana with her mother to gamble a couple of times. [RR 5: 55]

4.      She joined the Wharton Bar Association and filled out some piece of paper to get appointments.  The court (329th) appointed her to represent a juvenile. [RR 5: 12, 64]

5.     Cynthia explained she was a member of SAG and was auditioning for parts and meeting with "everybody" who is producing movies in Texas. She did not have a list of "everybody" she has been meeting. She explained she went to a cocktail party in Houston held by the Texas Film Commission. [RR 5: 62-63]

6.     She has not considered changing from international criminal defense and has not considered taking employment as a paralegal. She has not thought about getting trained in a different area. [RR 5: 65-67] She has not applied for work at a law firm. [RR 5: 13]

Cynthia's minimum monthly needs, in excess of $16,000, and her refusal to retrain or seek viable employment at any time, should not be considered as a reasonable basis for awarding her the Texas ceiling of $5,000 monthly. Cynthia could get a job. She could market her home at a price that would sell. [RR 5: 55-57]

Cynthia has not shown diligence in either earning sufficient income to provide for her minimum reasonable needs or in developing necessary skills. Because there are no facts to overcome the statutory presumption against spousal maintenance, the court abused its discretion when it ordered Frank to pay Cynthia $5,000/month.

WHEREFORE, PREMISES CONSIDERED, Appellant FRANCIS W. SINATRA respectfully requests the Honorable Court to sustain his first issue on common law marriage, and to thereafter issue its opinion and render judgment that Appellant and Appellee did not enter into an informal marriage; therefore, there was no community property to divide. In the event the Court finds a marriage existed, Appellant requests the Court to sustain his remaining issues, confirm his separate property, vacate the Final Decree of Divorce, and remand for entry of a decree in conformity with the Honorable Court's opinion. Appellant requests such other and further relief to which he may be entitled, both at law and in equity, and for which he will ever pray.

Respectfully submitted,

**JENKINS & KAMIN, L.L.P.**
TWO GREENWAY PLAZA, STE. 600
HOUSTON, TX 77046
TEL: 713-600-5500
FAX: 713-600-5501
lstanton@jenkinskamin.com(non-service)
jenkinskaminservice@jenkinskamin.com
(e-service)

*/s/ Lynn Kuriger Stanton*
By:_____
Lynn Kuriger Stanton
State Bar No. 11767600

59

**LAW OFFICE OF WARREN COLE**
3355 W. ALABAMA, STE. 825
HOUSTON, TX 77098
TEL: (713) 275-4444
FAX: (713) 400-9144
Email: warren@warcolelaw.com

*/s/Warren Cole*

By:_____
　　Warren Cole
　　State Bar No. 04549500

**ATTORNEYS FOR FRANCIS W. SINATRA**

## CERTIFICATE OF COMPLIANCE

This brief complies with the form requirements, including word limits, as contained in Rule 9.4, Texas Rules of Appellate Procedure. The brief was prepared using Wordperfect X5-6. The Word Count function states that the brief contains 14,382 words, excluding the items which are not to be counted under Rule 9.4(i)(1).

*/s/ Lynn Kuriger Stanton*

_____
LYNN KURIGER STANTON

## CERTIFICATE OF SERVICE

I certify that a true copy of the above Appellant's Brief was served on Robinson Ramsey and John Maher, who are appellate counsel and trial counsel for Cynthia Sinatra, via e-filing, on March 5, 2015.

ROBINSON C. RAMSEY
LANGLEY & BANACK, INC.
Trinity Plaza II, Suite 900
745 E. Mulberry
San Antonio, Texas 78212
rramsey@langleybanack.com

JOHN C. MAHER, JR.
THE LAW OFFICE OF JOHN C. MAHER, JR.
212 E. Burleson Street
Wharton, Texas 77488
johncmaher@sbcglobal.net


*/s/ Lynn Kuriger Stanton*

_____
LYNN KURIGER STANTON
Attorney for Francis Wayne Sinatra

The APPENDIX contains the following book-marked items:

**Final Decree of Divorce, June 26, 2014**

**Findings of Fact and Conclusions of Law**

**Final Consent Decree of Divorce, March 29, 2001**

**Summary of $$ Paid to-for Cynthia, RX-52**

**Frank's Trial Inventory,  RX-72**

**Petitioner's Exhibits 27 - 31**

**Texas Family Code, Sec.  2.401**

**Texas Family Code, Sec.  8.051**

**Texas Family Code, Sec.  8.052**

**Texas Family Code, Sec.  8.053**